## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

    -vs-                                 CRIMINAL No. 14-01128 JCH

LAWRENCE ANTHONY MARTINEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence (ECF No. 20). The Court held a hearing on the motion on October 28, 2014. The Court, having considered the motion, briefs, proposed findings of fact and conclusions of law, evidence, argument, and otherwise being fully advised, concludes that the motion to suppress should be granted in part and denied in part. The motion to suppress will be granted as to certain statements Defendant made in response to Officer Homero Alvidrez's questions while Defendant was seated handcuffed on the curb, in particular the statements Defendant made regarding not being allowed to have a firearm and to being a convicted felon, for failure to give *Miranda* warnings prior to the questioning.[1] The Court will deny the motion to suppress, however, in all other respects. The Court, for the reasons given herein, will not suppress the firearm or Defendant's statement in the bedroom that he had a firearm, because the discovery of the firearm did not offend the Fourth or Fifth Amendments. The Court will also not suppress Defendant's

---

[1] Under *Miranda v. Arizona*, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

status as a convicted felon or the methamphetamine, because that evidence would have been inevitably discovered separate and independent from the *Miranda* violation.

## I.   FACTUAL FINDINGS

On January 20, 2014, at about 12:16 p.m., a female caller reported to 911 that an approximately 3-year-old child next door was yelling for help for about 10 minutes.  *See* Def.'s Ex. A (Computer Aided Dispatch Report) at 1.  The caller said she had knocked on the door to the neighbor's house but got no response.  *See id.*  The caller noted that the garage was open with a car door open.  *See* Def.'s Ex. B (Recording of 911 Call).  The caller said that it sounded like the child was in the bathroom.  *See id.* at 2.  She said that the yelling "intermittently stops."  *Id.*  She reported that she did not hear any signs of violence, and the house is quiet other than the child yelling intermittently for "help."  *See id.*  She said that it sounded like the child was in the bathroom and could not get out.  *See id.*

Officers Homero Alvidrez, Levi Borunda, and Morant were dispatched to the scene.  *See* Def.'s Ex. C (Lapel camera video of Officer Borunda), D (Lapel Camera Video of Officer Morant), and E (Lapel Camera of Officer Alvidrez).  Officers Alvidrez and Borunda met the caller in Defendant's driveway in front of Defendant's garage.  *See* Def.'s Ex. C.  The caller told the police that she heard a child crying through a bathroom window.  *See id.*  Officers observed the open garage door with a motorcycle and expensive tools visible, as well as numerous expensive vehicles, including a BMW partially parked in the garage with its car door wide open.  *See id.*; Ex. E.  They observed cash lying on the top of the dashboard of the vehicle.  *See* Def.'s Ex. C; Mot. Hr'g Tr. 37, Oct. 28, 2014 (herein "Tr.").  Officer Alvidrez told Officer Borunda that it looked like a "31," shorthand for something "suspicious."  *See* Def.'s Ex. C; Def.'s Ex. G (List of 10 Code Translations).  Officer Morant entered the garage and waited for the other

officers near the door from the garage into the interior of the house.  *See* Def.'s Ex. D.

Officer Alvidrez walked along the side of the house to the back wall, stopped, and listened, before returning to the front door.  *See* Def.'s Ex. E.  Officer Alvidrez knocked once on the front door with no response.  *See* Def.'s Ex. C, E.  He walked back to the front of the garage, where he could hear the child yelling for help.  *See* Def.'s Ex. E.  Officer Alvidrez proceeded to the other side of the house and asked the child through the window if he was ok, to which the child responded, "Yeah."  *See id.*  Officer Alvidrez could not see the boy through the window because there were blinds on it.  Tr. 39.  Officer Alvidrez then asked, "What's going on?" to which the child replied, "Help me."  *See* Def.'s Ex. E.  Officer Alvidrez asked the child if he could look through the window. *See id.*  Officer Alvidrez said, "Hello, hello, hello, buddy, can you hear me?"  *Id.*  When he received no further response, Officer Alvidrez returned to the garage where he informed the other officers that he could hear the kid, but the kid stopped talking to him.  *Id.*  Officer Alvidrez walked once more to the side of the house, and again asked through the window, "Hey, buddy, are you ok?  Are you there?"  *Id.*  After receiving no response, Officer Alvidrez entered the garage.  *Id.*  The officers observed that the garage door into the home was ajar.  *See* Def.'s Ex. D; Tr. 41.

The officers, believing they had exigent circumstances to justify an entry into the home, decided to enter the house through the garage.  *See* Def.'s Ex. C, D, and E; Tr. 11-12, 39-41.  Officers believed, based on their observations and the fact that the child had been yelling in distress for approximately 20 minutes with no adult inside seemingly responding to the child, that there may have been a home invasion or burglary and that there may be people inside in need of aid.  *See* Tr. 9-10, 39-41.

Officer Alvidrez drew his firearm, pointed it down, and positioned himself so that he was

not visible from someone inside the home.  *See* Def.'s Ex. C, D, and E.  Officer Morant also drew his gun and pointed it down.  *See* Def.'s Ex. E.  The officers drew their side arms based on their officer safety training, given the unknown situation inside the home.  *See* Tr. 12.  Officer Morant pushed open the ajar garage door into the interior of the home and twice announced loudly, "Albuquerque Police.  If there is anyone in this residence, show yourself."  *See* Def.'s Ex. C, D, and E.  Lydia Lugo, Defendant's girlfriend, began to come down the hallway towards the door.  *See* Def.'s Ex. C, D.  Officer Morant asked if she could show herself and asked if she was alright.  *See* Def.'s Ex. C, D.

Officer Morant asked Ms. Lugo cordially, "Can we come in?"  Def.'s Ex. C, D.  At that time, no weapons were pointed at her.  *See* Def.'s Ex. E.  She responded affirmatively and unequivocally, "Yeah."  *See* Def.'s Ex. C, E.  Ms. Lugo was a resident of the home at the time she gave her consent.  *See* Tr. 82.

Officer Morant then asked her, "Why is he screaming?"  *See* Def.'s Ex. C, D, E.  Officer Alvidrez asked if there was anyone else in the house.  *See* Def.'s Ex. C, E.  She said yes, and he asked her, "what about any adults?"  Def.'s Ex. C, D, E.  Ms. Lugo acknowledged that there were kids and an adult in the house.  Def.'s Ex. C.  Officer Alvidrez asked if she could have him come over to talk to them.  *See* Def.'s Ex. C.

The officers followed Ms. Lugo into the house and down the hallway into the master bedroom.  Def.'s Ex. C, D, and E.  At no time did Ms. Lugo ever limit the consent she gave the officers to enter or tell them not to enter any particular room.  *See* Def.'s Ex. C, D, and E; Tr. 14.

The master bedroom was small and cluttered.  *See* Def.'s Ex. C, D, and E.  Officer Alvidrez saw Defendant asleep and motionless on the bed, despite the commotion, and when Ms. Lugo touched the Defendant to try to wake him, Officer Alvidrez asked if "he is drunk or

something?"  Def.'s Ex. C, E.  Ms. Lugo responded that he was asleep and that they were sick.
Def.'s Ex. C, E.  Officer Alvidrez then asked who was the kid screaming, and Ms. Lugo denied
that the screaming came from their home.  *See* Def.'s Ex. C, E. The officers, however, replied
that the screaming child was there, because they had heard him outside the bathroom window.
*See* Def.'s Ex. C, E.  Ms. Lugo responded, no, that there were no children in the master
bathroom, and that the children should be in their rooms.  Def.'s Ex. C, E.  At that moment,
however, an approximately one-year-old girl was sleeping on the bed in the master bedroom near
Defendant's head.  Def.'s Ex. E.  Officer Borunda observed that Ms. Lugo appeared confused, as
she denied anyone had been yelling for help and was unaware where the children were.  *See* Tr.
14-15.

Defendant still had not woken, so Officer Alvidrez loudly said, "Lawrence."  Def.'s Ex.
E.  When Defendant did not move, he asked Ms. Lugo again why he was passed out.  *Id.*  When
Ms. Lugo called out, "Lawrence," he awakened with a start.  *Id.*  Officer Alvidrez told him to
relax and began to explain that they were there because they heard some screaming from a kid.
*Id.*  Defendant responded, confused, "Screaming?  Why?"  *Id.*  Defendant said that he just barely
lay down, and that there was no boy screaming.  *Id.*  Officer Alvidrez responded that he heard
the child and asked loudly if he was calling him a liar, then told Defendant not to deny what he
was telling him.  *Id.*  Defendant said that his mom was out there.  *Id.*  Defendant's behavior and
unusual reaction caused the officers to believe there might be something medically wrong with
him.  *See* Tr. 16-17.

While Officers Alvidrez and Borunda were speaking with Ms. Lugo and Defendant,
Officer Morant entered the other rooms, briefly looking around, without opening or moving any
items.  *See* Def.'s Ex. D.  Officer Borunda then began to enter the other rooms also searching for

5

the boy.  *See* Def.'s Ex. C; Tr. 15.  He then asked Ms. Lugo, "Where are your children, ma'am?"  Def.'s Ex. C.  Ms. Lugo went to the other bedroom with Officer Morant to search for the boy, calling out "Anthony."  Def.'s Ex. D.  Officer Morant told Ms. Lugo that she needed to find the boy.  *Id.*  She then entered the garage to try to find him, again calling out "Anthony."  *See id.*  She returned to the other bedroom, calling "Anthony."  *Id.*

Meanwhile, Officer Borunda had returned to the master bedroom where Officer Alvidrez was telling Defendant why they were there and asking if he lived there.  *See* Def.'s Ex. C.  Officer Borunda went to the master bathroom, where he found the child on the toilet.  *See id.*; Tr. 15.  He said "hi" to the boy, and asked the child if he was done.  Def.'s Ex. C.  Officer Borunda then called to Ms. Lugo and asked her to get her child off the toilet because he needed some help.  *Id.*

While Officer Borunda cordially instructed Ms. Lugo to please get the child off the toilet, Officer Alvidrez said aloud that "he is 31," meaning Defendant was suspicious.  *See* Def.'s Ex. C, E.  Officer Alvidrez told Defendant cordially to stand up, asked if he had any weapons, and told him that he was going to pat him down for his safety.  Def.'s Ex. C, E.  Defendant told the officer that he felt like he was going to throw up and asked where his mom was.  Def.'s Ex. E.  Officer Alvidrez told him, "Let me pat you down first," and then after, if he needed to, he could throw up.  *Id.*

Ms. Lugo then got the boy off the toilet and assisted him when Defendant started moaning oddly and crying, breathing heavily, said that he had anxiety, and called for his mom.  Def.'s Ex. C, E; Tr. 47.  Officer Alvidrez told Defendant cordially that he is "acting too weird."  Def.'s Ex. C.  Defendant informed them again that he had anxiety.  *Id.*

Although the officers had determined that the boy was not in physical pain or danger,

they turned their attention to Defendant as they tried to learn why the adults had not been responsive to the boy's needs. *See* Tr. 21-22. In light of a recent high profile case involving a child who was killed by his parents, despite officers having been previously called to the scene for a child welfare check, there is a heightened concern in the community and at APD for the welfare of young children. *See id.* at 22-23. APD supervisors have instructed their officers to conduct a sufficient investigation during a child welfare check to ensure they are not leaving children in an unsafe environment. *See id.* at 22-23, 48-49. APD policy is to talk to whomever is in charge of watching the child to make sure they are not under the influence of drugs or alcohol and have the mental capacity to watch over the child. *See id.* at 48-49. Consequently, once Defendant began acting strangely and they learned that both Defendant and Ms. Lugo had taken medication to help them sleep, the officers needed to make sure they could safely leave the children in their care before they left. *See id*. at 22-24, 47-48, 50-51.

Officer Alvidrez said, "All I'm trying to do is pat you down. What do you mean you have anxiety? Try to take some deep breaths." Def.'s Ex. E. Because Defendant was acting unpredictably, Officer Borunda then drew his firearm, pointed it at Defendant, and told Defendant loudly to show both his hands. *See* Def.'s Ex. C, E; Tr. 26-27. From Officer Borunda's position in the room, one of Defendant's hands was partially hidden from his view, and it had looked to him like Defendant was moving his hands near his waist. *See* Def.'s Ex. C; Tr. 26-27. Officer Borunda drew his firearm at low ready in order to protect his partner. Tr. 28-29. Defendant said while crying, "Sorry, sir." Def.'s Ex. E. Officer Alvidrez told Defendant that he was acting a little too weird. *Id.*

Ms. Lugo sat down on the bed, and she and Defendant tried to explain that Defendant got anxiety really bad. *Id.* Ms. Lugo then asked if she could get the baby. *Id.* Officer Borunda told

Ms. Lugo to get the baby off the bed, which she did.  Def.'s Ex. C, E.  Officer Borunda had already lowered his weapon, and he assisted them out of the room.  *See* Def.'s Ex. E.

Officer Alvidrez asked Defendant why he was freaking out, and Ms. Lugo responded that it was because they were in their bedroom and he did not know what was going on.  *Id.*  Defendant began crying and moaning, asking for his mom repeatedly and asking where she was at.  *Id.*  Officer Alvidrez then asked again if anyone else was in the house.  *Id.*  Ms. Lugo said that there was a roommate who was not there.  *Id.*

Ms. Lugo then left the room with the children and went with Officer Morant into the living room.  Def.'s Ex. D.  She denied that it was her child yelling out.  *Id.*  Officer Morant spoke with the child, asking if he was alright and why he was screaming so loudly.  *Id.*

Meanwhile, Officer Alvidrez asked Defendant cordially for his name, telling him to take deep breaths and that they were not there to hurt him, but were just there to check on the child screaming.  Def.'s Ex. C, E.  At that point, Officer Borunda examined what appeared to be a medicine bottle on the top of the dresser.  *See* Def.'s Ex. E.  Officer Borunda believed that Defendant's erratic behavior could be due to anxiety, but it was also consistent with being under the influence of drugs.  *See* Tr. 24.  Defendant cried and said, "Please, help me."  Def.'s Ex. E.  Officer Alvidrez asked what he needed help with.  *Id.*  Officer Borunda asked if he needed rescue or emergency medical attention.  Def.'s Ex. C, E.  Defendant said, "No, sir.  I can't breathe."  Def.'s Ex. E.  The officers then called rescue.  *Id.*

Ms. Lugo returned to the bedroom with the children.  Def.'s Ex. D.  Defendant was crying and moaning as Ms. Lugo told the officers she was a medical assistant and asked to give Defendant his medicine.  Def.'s Ex. C.  Officer Borunda instructed her to leave the room with the child and stay out of the room, because he was concerned for the safety of Ms. Lugo and the

children.  *See id.*; Tr. 18-19.  Officer Borunda asked her to tell him where the medicine was, telling her he just wanted her to stay out of the room for all their safety.  Def.'s Ex. C. Defendant said he got anxiety attacks and that he was ok.  Def.'s Ex. E.  Defendant was still lying on the bed on his back with his hands up.  *Id.*  Ms. Lugo then left the room again with Officer Morant.  Def.'s Ex. D.

In the living room, Officer Morant asked if the boy was ok and explained that the officers were trying to figure out what was going on and why the adults could not hear their son.  *See* Def.'s Ex. D.  Officer Morant asked what was going on with her husband.  *See id.*  Ms. Lugo responded that he got panic attacks from his PTSD.  *Id.*  Officer Morant asked her where his medicine was located.  *Id.*  Ms. Lugo replied, "I don't know," and that he could go look in the bathroom.  *See id.* Officer Morant asked her what medicine he took.  *See id.*  She replied, "I don't know," and that he took medicine to calm down.  *See id.*  Officer Morant responded that they would have rescue come check him.  *See id.*

Meanwhile, Officer Alvidrez asked Defendant cordially if there were handguns or weapons in the room.  Def.'s Ex. E.  When Defendant did not answer, Officer Alvidrez explained that he had not patted him down, that he wanted him to calm down, but that because Defendant was acting so strangely, he wanted to know if Defendant had guns in the house for all of their safety.  Def.'s Ex. C, E.  Defendant did not respond right away, which Officer Alvidrez found suspicious and caused him to be further concerned for their safety.  *See* Def.'s Ex. E; Tr. 51-52.  Officer Alvidrez asked if that was a "yes or no?"  Def.'s Ex. E.  Officer Alvidrez calmly explained that he was getting ready to put handcuffs on Defendant because he was acting "so strange."  *Id.*  When he again asked if Defendant had weapons on him, Defendant nodded affirmatively.  *Id.*  Defendant admitted to having a handgun in his waistband.  Def.'s Ex. C; Tr.

52-53.

Meanwhile, Officer Borunda looked around the bedroom and bathroom, scanning for other weapons or illegal drugs to give a better indication of what might be going on with Defendant.  *See* Def.'s Ex. C; Tr. 20-21.  Upon learning that Defendant had a weapon, Officer Borunda came over with his weapon drawn and pointed at Defendant.  Def.'s Ex. C, E.  The weapon was tucked in Defendant's waistband.  *See* Tr. 52-53.

Officer Alvidrez asked what kind of weapon he had on him.  Def.'s Ex. C, E.  Officer Alvidrez instructed Defendant to keep his hands where they were and not to reach for it.  Def.'s Ex. E.  Defendant said he was not going to move and that he could not breathe.  Def.'s Ex. C. Officer Alvidrez secured the weapon.  *See* Tr. 53-54; Ex. F (APD Supplemental Police Report).

Officer Borunda informed Defendant that medical was on the way.  Def.'s Ex. C.  Officer Borunda had his weapon drawn as Defendant was panicking and moaning, telling the officers about his anxiety and that he was having an anxiety attack.  *Id.*  Officer Alvidrez asked Defendant to walk outside and talk to him, so that he could breathe while sitting on the curb and because Officer Alvidrez said he felt unsafe in the room.  *Id.*

Defendant responded that he could not just get up, that the anxiety started in his upper body, so that to get up, he needed to roll first on his stomach.  *Id.*  Officer Alvidrez told Defendant that he would assist him by holding his pocket and rolling him over, but he needed to keep his hands where he could see them.  *Id.*  Defendant appeared to drop to his knees in front of the bed, causing the officers to be concerned that he might try to reach for another weapon.  *See* Tr. 55-56.  Officer Borunda had his weapon drawn as Officer Alvidrez helped Defendant get off the bed and stand up.  Def.'s Ex. C.  Officer Alvidrez then handcuffed him for his safety, so he could walk him outside to get air.  *Id*.  Officer Borunda stated, "He is alright, buddy."  *Id.*  After

10

Officer Alvidrez escorted Defendant outside, Officer Borunda stayed in the room and briefly scanned the tops of the shelves. *Id.*

In the meantime, after Ms. Lugo left the room, she explained to Officer Morant that Defendant got panic attacks from his PTSD as a child and needed his medicine. Def.'s Ex. D. Officer Morant explained that they were just there on a welfare check and would leave after rescue arrived to assess Defendant, who was acting creepy. *Id.*

Officer Borunda later re-entered the living room where he explained to Ms. Lugo and her children why the police were at the house. Def.'s Ex. C. Officer Borunda explained that they entered to make sure everyone in the house was ok, but that when they found Defendant and he was having a panic attack, they needed to call rescue to treat him. *Id.* Ms. Lugo responded that they were sick and took medicine. *Id.* Officer Borunda then left the house through the garage to assist Officer Alvidrez. *Id.*

Outside, Officer Alvidrez was with Defendant, who was handcuffed and sitting on the curb. *Id.* Although he had handcuffed Defendant, Officer Alvidrez did not consider him under arrest; rather, he had handcuffed him because of the weapon found on his person and his strange behavior. *See* Tr. 25-26, 57-58. Police commonly handcuff a suspect without arresting him for officer safety reasons. *See id.* at 25-27. When there are safety concerns and the officer is turning over the person to medical rescue personnel for assessment, it is standard procedure to check the person for weapons and sometimes to handcuff him. *See id.* at 56-57.

Officer Alvidrez continued to talk to Defendant cordially, asking if he was a mechanic. *See* Pl.'s Ex. 1. Defendant was cooperative and responded that he was and that was why he had all the cars at the house. *See id.* Officer Alvidrez asked Defendant where his roommate was and what was up with him. *Id.* Defendant indicated that his roommate was in the house. *Id.* Officer

11

Alvidrez then called Officer Borunda over and told him that he still thought there was someone in the house.  *Id.*

Officer Borunda then returned to the house and walked around the house scanning the rooms, while Officer Morant continued to talk to Ms. Lugo in the living room.  Def.'s Ex. C. Officer Borunda did not move things around or open anything, but he looked in closets and on dressers.  *Id.*  There was a locked door to a bedroom, but neither Officer Borunda nor the other officers entered the locked room.  *See* Tr. 107-08, 119.

Ms. Lugo remained seated with the children on the sofa.  Def.'s Ex. D.  The children remained calm and looked well.  *Id.*  Officer Morant stayed with Ms. Lugo and the children in the living room.  *Id.*  After some time, Ms. Lugo and the kids got off the couch.  *Id.*  She went to the bathroom with her son to put on his pants, they returned to the living room, and the kids began playing.  *Id.*

In the meantime, while they waited for rescue, Officer Alvidrez continued his conversation with Defendant.  *See* Pl.'s Ex. 1.  Defendant explained to Officer Alvidrez what had happened and why the cars were like they were.  *Id.*  Officer Alvidrez again explained why they were doing a welfare check and that they were not searching for anything.  *Id.*  Officer Alvidrez then asked, "Why do you have a gun on you, though?"  *Id.*  Defendant explained that he rolled on top of it and that he "is not supposed to be around guns."  *Id.*  Officer Alvidrez said cordially that he put himself and the officers in a bad situation, and that they had kids in there.  *Id.* Defendant explained that the gun was his girlfriend's.  *Id.*  Officer Alvidrez called for an impact unit.  *See id.*  Officer Alvidrez then asked Defendant, "How come you are not supposed to be around guns?"  *Id.*  Defendant replied that he was a convicted felon.  *Id.*

Medical rescue personnel then arrived and began assessing Defendant.  Def.'s Ex. C,

Pl.'s Ex. 1.   When Officer Borunda came outside again to assist Officer Alvidrez, Officer Alvidrez informed him that Defendant was a convicted felon.   Def.'s Ex. C.

Sergeant Tyrone Chambers arrived on the scene, and Officer Alvidrez explained the situation to him.   Def.'s Ex. I (Lapel Camera Video of Sergeant Tyrone Chambers).   Officer Alvidrez said that Defendant was a convicted felon and was in possession of the firearm.   *Id.* Sergeant Chambers instructed Officer Alvidrez to "run him now."   *Id.*   Sergeant Chambers noted that, when on a welfare check call, they should not be looking around for everything else.   *Id.*

It is standard, routine APD procedure to run an NCIC warrant check before leaving a house for a welfare call, particularly where the officers had found it necessary to handcuff a person.   *See* Tr. 27-28, 49-50.   Before leaving a home on a child welfare call, officers are trained to run the caretaker's name for prior offenses and warrants as part of their investigation to ensure the caretaker is a safe person and can care for the children.   *See id.* at 49-50.   Consequently, the officers would have run a warrants check and discovered Defendant's status as a convicted felon even had he not admitted to being one.   *See id.* at 27-28, 49-50, 59.   In conducting the records check, officers also learned that Defendant had a misdemeanor warrant for his arrest.   *See id.* at 58-59.

After medical personnel were finished examining Defendant, Officer Alvidrez placed Defendant under arrest and gave him *Miranda* warnings.   *See* Def.'s Ex. F, I.   Officer Alvidrez conducted a search of Defendant's person, as required by APD policy to make sure he did not have any weapons or anything illegal in his pockets, because he was going to be transported by police car to a sub-station and then jail.   *See* Tr. 64.   Officer Alvidrez found a small plastic bag with a white crystal substance in the front left pocket of his pants, which officers later determined to be methamphetamine.   *See* Tr. 64; Def.'s Ex. F.

On April 9, 2014, a federal grand jury indicted Defendant with being a felon in possession of a firearm and ammunition, possession with intent to distribute a mixture and substance containing methamphetamine, and carrying and possessing a firearm during and in relation to a drug trafficking crime.  Defendant has moved to suppress the evidence discovered and the statements he made at the scene.

## II.   ANALYSIS

### A.   Exigency

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const., amend. IV.   Physical  entry of the home is the chief evil against which the Fourth Amendment is directed.  *Wilson v. Layne*, 526 U.S. 603, 610 (1999) (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*,   407 U.S. 297, 313 (1972)).   Warrantless searches and seizures inside a home are presumptively unreasonable.  *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992).  Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant.  *Payton v. New York*, 445 U.S. 573, 590 (1980).  "The government bears the burden of proving the exigency exception to the warrant requirement applies;" a burden that "is especially heavy when the exception must justify the warrantless entry of a home."  *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

The test for determining whether the risk of personal danger created exigent circumstances is (1) whether the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) whether the manner and scope of the search is reasonable.  *Id.* at 718.  The exigent circumstances exception

14

to the warrant requirement is narrow and must be jealously and carefully drawn. *Anderson*, 981 F.2d at 1567 (quoting *United States v. Aquino*, 836 F.2d 1268, 1270 (10th Cir. 1988)).  The court must examine the circumstances as they would appear to a prudent, cautious, and trained officer. *Najar*, 451 F.3d at 718-19.  An officer needs objectively reasonable grounds giving rise to exigent circumstances based on something more than a generalized belief that such circumstances might exist.  *See*, *e.g.*, *United States v. Davis*, 290 F.3d 1239, 1243-44 (10th Cir. 2002).  Reasonable belief, however, "does not require absolute certainty; the standard is more lenient than the probable cause standard." *United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010) (citing *Najar*, 451 F.3d at 718).

Where there is a need to assist persons who are seriously injured or threatened with such injury, the exigency obviates the need for a warrant. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  "Officers do no need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009).  Instead, officers need only an objectively reasonable basis for believing that a person within the house is in need of immediate aid.  *Id.* at 47.  The first question here is thus whether it was reasonable for the officers to believe their entry was necessary to render immediate aid to the child or another potentially incapacitated occupant of the house.  *See Porter*, 594 F.3d at 1257 n.8.  The Court concludes that it was.

The child had been calling repeatedly for help for 20 minutes.  A neighbor tried to check on the child's welfare by knocking on the front door to no avail.  Officers also tried to get the occupants to respond to the front door without response.  Officer Alvidrez spoke to the child through the window, and the child again requested help, and no adults in the home responded to him.  Moreover, the state of the garage and the open car door gave additional reasons for officers

15

to suspect that perhaps some sort of foul play had occurred to cause the adults in the house not to be able to help the child.  Although the child did not seem to be in severe pain, they believed him to be about 3 years old without adult supervision.  His young age and requests for help gave them reason to believe he might be threatened with serious injury if left unattended.  Officers had a reasonable belief that the child or other potential occupants of the home needed immediate aid to justify their entry into the garage and opening the door into the interior of the home.  *Cf. Fisher*, 558 U.S. at 45-46, 49 (holding that officers had objectively reasonable basis for believing medical assistance was needed to enter house where police saw a truck with its front end smashed, broken house windows, blood on the truck, and could see the suspect screaming and throwing things with a cut on his hand, even though the suspect told the officers to go get a search warrant).

Defendant here also challenges the scope and manner of the search.  After finding the child and observing that he was not physically injured, the officers switched their attention to Defendant, who had been asleep, and initially non-responsive, despite the commotion.  Officers thus had reason to believe Defendant might be in need of medical assistance, so awakening him to ensure he was not in need of help was reasonable.  Moreover, officers had reason to further question the adults to ensure that they were in a condition to take care of their children safely in light of the following facts:  the adults had been non-responsiveness to the child's repeated calls; when Ms. Lugo woke up, she was unaware where her children were; and Ms. Lugo told the officers both she and Defendant had taken medication as an explanation for their sleeping through the child's calls.  The reason for the exigency thus had not entirely diminished before Defendant began acting strangely and created another exigency related to his and the children's welfare.

When Defendant awoke, he was unaware that his son had been yelling, and during the course of Officer Alvidriz explaining the officers' presence in his house, Defendant began acting strangely by moaning, crying, crying out for his mother, and telling the officers he had anxiety. Officer Alvidrez acted reasonably in continuing to talk to Defendant to assess his condition. Defendant later stated he had difficulty breathing and requested help from the officers. The officers acted reasonably in contacting medical rescue, despite Defendant's waffling on his need for help. They also had reason to fear for their safety and ask Defendant if he had any weapons, given his erratic behavior and the close, cluttered confines of the room.

The fact that Officer Borunda drew his weapon on Defendant and that Officer Alvidrez handcuffed him inside the master bedroom was not unreasonable under the circumstances. Police officers are not required to take unnecessary risks in performing their duties and are authorized to take steps reasonably necessary to protect their personal safety and maintain the status quo during an investigative detention. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996). An officer may conduct a limited protective frisk to search for weapons if he has a reasonable suspicion that the suspect is armed and dangerous. *See Adams v. Williams*, 407 U.S. 143, 146-48 (1972). *See also United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993) (explaining that a protective search/frisk permits an officer to conduct a limited search for weapons for his own protection where the officer has a right to be in the suspect's presence and the officer harbors an articulable and reasonable suspicion that the suspect may be armed and dangerous).

The first time Officer Borunda drew his weapon and pointed it at Defendant, he did so after Defendant began acting strangely and they were concerned he might assault them and/or have a weapon. Officer Borunda testified he drew his weapon when he could not see

17

Defendant's hands and believed he might be reaching towards his waist for a weapon.  Officer Borunda put down his weapon shortly thereafter when Defendant showed his hands and the perceive threat abated.  Although a person would be understandably upset to wake up to police officers in one's bedroom, Defendant's reaction was one that could reasonably be construed as confusion due to being under the influence of drugs or to mental instability.  Defendant did not awaken to his son's cries or to the commotion caused by the officers' presence.  His odd, erratic behavior in the close quarters of the cluttered bedroom gave the officers reason to be concerned for their safety.

The second time Officer Borunda drew his weapon occurred after Defendant's repeated refusals to answer Officer Alvidrez's questions regarding the presence of weapons, which gave the officers reason to suspect that he might be armed.  Officer Borunda only drew his weapon for as long as required for Officer Alvidrez to confirm whether Defendant had a weapon and to secure it.

In sum, Officer Alvidrez reasonably asked about weapons and conducted a pat-down search of Defendant for their safety, while they questioned Defendant concerning his condition and why he was unresponsive to his child's cries.  The use of handcuffs was reasonable after Defendant admitted to having a firearm in his waistband and given his strange behavior.  *Cf. United States v. DeJear*, 552 F.3d 1196, 1198-1201 (10th Cir. 2009) (concluding that district court properly determined that officer had reasonable suspicion to detain suspect, which occurred when officer pointed gun at suspect and told him to show his hands, where officer saw suspect stuff item into space in car, was nervous, refused to show his hands, and was in a high crime area).

Nor did the officers' entering rooms and conducting visual scans exceed the scope of the

reason for their entry.  One factor in determining the reasonableness of a search is whether the officers limited themselves to a visual scan of the rooms where an emergency might reasonably be associated or whether they opened drawers or otherwise conducted a more thorough search for contraband or evidence of a crime.  *See Porter*, 594 F.3d at 1257 n.8.    While Officer Alvidrez was assessing Defendant's condition, Officer Borunda and Officer Morant went throughout the house, entering and looking about the rooms.  Initially, the officers looked through the rooms in an attempt to find the child.  Ms. Lugo followed Officer Morant, looking for the child as well.  The officers, while scanning the rooms, did not open drawers or otherwise search the residents' belongings.  The officers' visual scan of the master bedroom for weapons or drugs to explain Defendant's behavior was also reasonable under the circumstances.  Later, Officer Borunda re-entered the rooms searching for the adult roommate after Defendant indicated he might be inside, a reasonable search under the circumstances for officer safety.  The officers never entered a locked room, showing concern for the rights of the occupants.  Finally, as discussed more thoroughly below, Ms. Lugo gave consent to the officers to enter the home after learning that they were there to check on the welfare of the child and did not object to their entry and visual scans of the rooms.  Consequently, the manner and scope of the officers' search was reasonable and did not exceed the purpose of their entry to conduct a welfare check on the occupants of the home or the consent given to enter the home.

### B.    Consent to Enter and Search

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained."  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  For consent to be valid,

the Government must show:   (1) the consent was unequivocal, specific, and freely and intelligently given, and (2) it was given without implied or express duress or coercion.  *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007); *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997).   As to the first prong, the consent must be clear, but it need not be verbal, so long as the gestures or other indications of acquiescence are "sufficiently comprehensible to a reasonable officer."  *Guerrero*, 472 F.3d at 789-90.   The second prong turns on whether a reasonable person would believe she was free to deny the officer's request to enter or search.  *Id.* at 790.   Courts consider several factors in determining whether consent was coerced:   the threatening presence of several officers; the brandishing of a weapon by an officer; physical mistreatment; use of violence, threats, promises, inducements, deception, or trickery by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; absence of other members of the public; the physical and mental condition and capacity of the person; and whether an officer informed the person of her right to refuse consent.  *Id.* at 490 (quoting *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir.1996)); *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006).

In this case, Ms. Lugo, a resident of the home, gave clear, unequivocal consent that the officers could enter.  Although Officer Morant commanded that an occupant come to the door, once Ms. Lugo came towards the door, his tone changed.  He asked if she was alright and then asked if they could come in, he did not demand it.  At the time the officers asked her consent, they did not have their weapons drawn on her.  Nothing in Ms. Lugo's tone suggested fear or coercion.  The fact that Ms. Lugo led them into the back of the house further indicated to a

reasonable officer that Ms. Lugo was granting them permission to follow her farther inside the house. Ms. Lugo at no time revoked her consent or otherwise indicated her consent was limited. She at no time told officers not to follow her or not to enter certain rooms. Nor did she tell officers to leave her home. The totality of the circumstances shows that she gave clear consent and was not under duress or coercion, and thus her consent to enter and to check on the welfare of the child was valid. *See Guerrero*, 472 F.3d at 790 ("[N]either Defendant objected during the search itself, which, while not dispositive, is often a good indicator that consent existed.").

Officers discovered the firearm after Officer Alvidrez told Defendant that he was going to pat him down for his safety. Defendant continued to act strangely and was non-responsive to Officer Alvidrez's request that he stand up for a pat-down search. At that point, Officer Borunda drew his firearm, pointed it at Defendant, and told him to show his hands. The Court agrees with Defendant that under these circumstances, Defendant did not voluntarily consent to a search of his person free from coercion. As discussed above, however, the officers were validly in the master bedroom based on Ms. Lugo's consent and the exigent circumstances exception to the warrant requirement. While there, they had a reasonable basis, based on Defendant's behavior, to fear for their safety to question Defendant about the presence of weapons and to conduct a limited pat-down search. The officers' search of Defendant's person and seizure of the firearm therefore did not offend the Fourth Amendment.

### C.  *Miranda* **Warnings**

The Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V.  Relying on the Fifth Amendment, the Supreme Court has held that if police take a suspect into custody and interrogate him, they must inform him of his *Miranda* rights, or his responses cannot be introduced into evidence at trial to

establish his guilt.  *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

The *Miranda* safeguards apply "as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"  *Id.* at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  An investigative detention does not trigger *Miranda*.  *See United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).  A suspect, however, may be "in custody" before he is formally placed under arrest.  *Berkemer*, 468 U.S. at 441.  A court must determine whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of a formal arrest.  *Id.* at 441-42; *Jones*, 523 F.3d at 1239.  An arrest is characterized by a highly intrusive or lengthy search or detention.  *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).  The use of firearms does not automatically transform an investigative detention into an arrest, so long as officers have an objectively reasonable suspicion to be concerned for their safety.  *See United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

To determine custody, courts look to the totality of the circumstances.  *Jones*, 523 F.3d at 1240.  Several non-exhaustive factors guide the court's inquiry:  (1) the extent to which the suspect is made aware that he is free to not answer questions or end the interview at will; (2) the nature of the questioning, particularly whether prolonged accusatory questioning is likely to create a coercive environment; (3) separation of the suspect from family or others who could offer moral support; (4) isolation in non-public questioning rooms; (5) the threatening presence of several officers; (6) display of a weapon; (7) physical contact with the subject; and (8) an officer's use of language or tone implying that compliance with the request might be compelled. *Id.*

"Interrogation" under *Miranda* refers to either express questioning or its "functional equivalent" -- any words or actions by police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). It reflects "a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. Any statement given freely and voluntarily without compelling influences is admissible in evidence. *Id.* at 299-300 (quoting *Miranda*, 384 U.S. at 478). Volunteered statements are not barred by the Fifth Amendment. *See id.* at 300. Police cannot be held accountable for the unforeseeable results of their words or actions; therefore, *Miranda* applies to words or actions by police that they should have known were reasonably likely to elicit an incriminating response. *Id.* at 301-02.

### 1.      Discovery of the Firearm

Defendant argues that he was in custody at the time Officer Borunda pointed his weapon at him and Officer Alvidrez asked him repeatedly if he had a firearm. At the point when Defendant admitted to having the firearm, Defendant was not handcuffed and Officer Alvidrez told Defendant he wanted to pat him down for their safety. As discussed *supra*, the officers had an objectively reasonable suspicion to be concerned for their safety, given Defendant's erratic behavior, that justified displaying the firearm while ensuring Defendant was not armed.

"[A]n officer may question a suspect in custody without first giving the *Miranda* warnings if the questions arise out of 'an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon.'" *DeJear*, 552 F.3d at 1201 (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)). For an officer to reasonably believe he is in danger, he must have reason to believe that the defendant might have or recently have had a weapon and that someone other than the police might gain access to that weapon and

inflict harm with it.  *See id.* at 1201-02.  Although the officers did not have any specific information that Defendant had a gun, Defendant's strange behavior; his close physical proximity to the officers in an unsecured, disorderly room; and his failure to answer whether he had a weapon gave officers a reasonable belief that they might be in danger.  The officer's questions at that stage were not designed to acquire incriminating evidence, but solely to protect the officers, Defendant, and the other occupants in the home from physical injury.  The Court will therefore not suppress Defendant's statement admitting to having the firearm in his waistband based on the public safety exception to *Miranda*.  *Cf. DeJear*, 552 F.3d at 1202 (applying *Quarles* public safety exception where officer asked suspect what he was stuffing into seat and suspect's twice refusal to show his hands); *United States v. Lackey*, 334 F.3d 1224, 1225-26 (10th Cir. 2003) (holding that officer properly asked suspect if he had any guns or sharp weapons on his person after he was in custody but before he was informed of his *Miranda* rights based on concern for officer and the suspect's safety); *United States v. Duncan*, 308 F. App'x 601, 603-06 (3d Cir. Jan. 30, 2009) (unpublished opinion) (holding that officers could ask suspect if he had weapon without advising him of *Miranda* rights where officers approached suspect for public drinking, they saw him try to hid beer bottle on floor while shoving a shiny silver object into his pocket, suspect was nervous, and he made quick movements with his arms); *United States v. Brady*, 819 F.2d 884, 888 (9th Cir. 1987) (holding that suspect was not entitled to *Miranda* warning, despite being in custody and asked question whether he had a gun in his car, based on public safety exception where officer had reason to stop suspect for battery, they were in rough neighborhood, a crowd was gathering, it was growing dark, and car door was open with keys in ignition).

      **2.**      **Discovery of Defendant's felon status**

The Government does not contest that Defendant was in custody for purposes of *Miranda* when Defendant was on the curb and admitted to not being allowed to be around guns, and thus, the Court will assume custody at that time for purposes of this opinion.[2]   The Government nonetheless argues that Defendant's admission to not being allowed to be around guns was not made in response to an interrogation, and thus, should not be suppressed.

"Interrogation" occurs with "express questioning" *or* its "functional equivalent."  There is no question that Officer Alvidrez asked Defendant numerous express questions concerning the suspicious circumstances police observed at the house.  Officer Alvidrez asked Defendant multiple questions that were reasonably likely to elicit incriminating responses.  For example, Officer Alvidrez found the number of cars present suspicious, so his questions regarding the cars were designed to confirm or dispel his suspicions regarding them.  The questions regarding the child crying for help also may have elicited an incriminating response, as police suspected that he may have been inhibited to a degree that he neglected his child, a possible criminal offense.  That these questions regarding the cars and child did not ultimately result in an inculpatory answer does not mean that the questions were not intended to elicit a potentially incriminating response, and could not reasonably be construed as such.  Similarly, the question "Why do you have a gun on you, though?" was reasonably likely to elicit an incriminating response.  Although the incriminating answer Defendant ultimately gave, that he was not supposed to have a gun, was not exactly responsive to the question, Officer Alvidrez had reason to believe that Defendant would have given some incriminating response to that question.

---

[2] The Government, in its response, explains that before *Miranda* warnings are required, a suspect must be in custody and subject to interrogation.  *See* Pl.'s Resp. 13, ECF No. 34.  The Government also notes that a suspect may be placed in custody for *Miranda* purposes before being formally arrested.  *Id.*  The Government then proceeds to discuss the law on "interrogation," and argues why the facts do not amount to an "interrogation."  *See id.* at 13-14. Significantly, the Government later concedes, "Because Alvidrez should know the question 'why aren't you supposed to be around guns' will likely prompt an incriminating response, *Miranda* warnings are required prior to *that* question."  *Id.* at 15.  The Government thus appears to concede that Defendant was in custody when handcuffed on the curb.

Given the express questioning by Officer Alvidrez concerning the numerous suspicious circumstances the police found at the home, this is not a circumstance where it would have been unforeseeable that his questions would have resulted in Defendant responding with incriminating answers.  The fact that the tone of the conversation between Officer Alvidrez and Defendant was calm and friendly does not negate the fact that the express questioning constituted an "interrogation."   To hold otherwise would allow officers to circumvent *Miranda* by merely questioning a suspect in custody in a friendly manner.  It is the express questions by the officers, friendly or no, that reflect the measure of compulsion above and beyond that inherent in custody itself.  *See Innis*, 446 U.S. at 300-01 ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.  We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.") (Internal footnote omitted).

The Court therefore concludes that, given the Government's failure to contest that Defendant was in custody while handcuffed at the curb, Defendant was subject to interrogation and should have been given *Miranda* warnings prior to Officer Alvidrez questioning him in the manner he did.  The statements Defendant made to Officer Alvidrez in response to his express questions should therefore be suppressed.

### D.     Inevitable Discovery Doctrine

The inevitable discovery doctrine is an exception to the exclusionary rule, and permits evidence to be admitted 'if an independent, lawful police investigation inevitably would have discovered it.'"   *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (quoting *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986)).  The government has the burden of proving by a preponderance of the evidence that the evidence would have been discovered

without the constitutional violation.  *Id.*  "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred."  *Id.* (quoting *United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000)).

The Tenth Circuit has stated that "the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct."  *United States v. Larsen*, 127 F.3d 984, 986 (10th Cir. 1997). The only requirement is that "the lawful means of discovery be 'independent of the constitutional violation.'"  *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (quoting *Larsen*, 127 F.3d at 987)).

### 1.      Discovery of Firearm

The officers found the firearm during their process of conducting a pat-down search of Defendant.  The Court has determined this pat-down search was lawful, and thus, officers would have discovered the firearm independent of Defendant's admission to having it.  Consequently, even if there were a *Miranda* issue when Officer Alvidrez asked Defendant repeatedly whether he had a firearm, the Court finds that the inevitable discovery exception applies to the firearm itself.  The Court will therefore not suppress the firearm.

### 2.      Discovery of Defendant's Convicted Felon Status

The Government argues that the fact that Defendant is a convicted felon, as well as the methamphetamine discovered in the subsequent pat-down search, should not be excluded as "fruit of the poisonous tree," because that evidence would have been inevitably discovered as well.  The Court finds that the Government met its burden of proving that the officers' normal

procedure would have been to conduct an NCIC check, even without an admission by Defendant to not being able to be around guns. Both Officers Borunda and Alvidrez testified that it was standard operating procedure to run an NCIC check for warrants before leaving a house on a child welfare call, especially where a person is handcuffed during the incident for officer safety reasons. The Court finds their testimony credible on this matter and finds that the officers would have run an NCIC check before leaving the scene. Because Officer Alvidrez would have run an NCIC check on Defendant prior to leaving the scene, he would have discovered that he was a convicted felon separate and independent of the *Miranda* violation. Officer Alvidrez would have arrested Defendant in this separate, independent, and lawful investigation and would have found the drugs during the pat-down search during the lawful search incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) (explaining that exception to the Fourth Amendment's warrant requirement is a search incident to a lawful arrest).

Moreover, in running the NCIC check prior to leaving the scene of the welfare check, the officers would have discovered that Defendant had a misdemeanor arrest warrant and would have arrested him based on the arrest warrant. *See* Tr. 58-59. The officers thus would have conducted a lawful pat-down search incident to the arrest warrant and discovered the methamphthetamine, even had they not discovered the firearm and his convicted felon status.

For all the foregoing reasons, the Court will not suppress the officers' discovery of Defendant's status as a convicted felon or the drugs discovered during the pat-down search. *Cf. United States v. Cintron*, 482 F. App'x 353, 359-60 (10th Cir. June 5, 2012) (unpublished opinion) (holding that sergeant's testimony that he would have conducted records check and discovered suspect's status as felon even if he had not switched handcuffs and placed suspect in back of police car showed that his actions were unrelated to records check, and therefore, results

of records check should not be suppressed).

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (**ECF No. 20**) is **GRANTED in part** and **DENIED in part** as follows:

1.      The motion is **GRANTED** as to Defendant's statements made while handcuffed on the curb, in response to Officer Alvidrez's express questioning.  In particular, the Court will suppress Defendant's statement that he should not have a gun and that he is a convicted felon.

2.      The motion is **DENIED** in all other respects.

3.      The Court will not suppress Defendant's statement in the bedroom that he had a firearm, the firearm itself, Defendant's status as a convicted felon, or the methamphetamine.

_____
**UNITED STATES DISTRICT JUDGE**